We move to the third case this morning, BRC Rubber & Plastics v. Continental Carbon. Good morning, Your Honors. May it please the Court, my name is Jeremy Gayed. I am counsel for BRC Rubber & Plastics. This appeal involves what we believe are two errors by the District Court that involve fairly straightforward but also fairly important legal issues. The amended complaint, the supply agreement at issue as a requirements contract, should be permitted to change its legal theory in direct and compelled response to this Court's prior order, which told us that that agreement was not a requirements contract. And the second issue is whether, if BRC is permitted to do that, that supply agreement is supported by consideration. The first issue we believe is a fairly straightforward one that goes to the heart of Rule 8 and the heart of the system of notice pleading. As this Court well knows, the notice pleading system embodied by Rule 8 replaced code pleading, and in code pleading, a party was required to match up facts with a legal theory, and errors in that delicate dance were fatal. Notice pleading was for the express purpose of replacing a system of notice in which the plaintiff's obligation in a complaint was merely to put the defendant on notice of the facts that gave rise to the cause of action. The case law is ample, from the Vitamos case to Whitaker to Chessie Logistics, and the Supreme Court in Johnson v. Shelby post-Twombly emphasized, under a notice pleading system, a plaintiff is allowed to be wrong about its legal theories, and that's not fatal, as long as the facts in the complaint are sufficient to fulfill the notice function of Rule 8. And we believe that that is exactly what happened here. There is no dispute that BRC's amended complaint characterizes the supply agreement as a requirements contract and does it consistently, and we're not trying to argue otherwise. But separately from its legal characterizations of the supply agreement, BRC's amended complaint alleges all of the facts that support its current legal theory of the case as one of a breach of a contract for a fixed quantity of approximately 1.8 million pounds per year. In paragraph 11 of the complaint, BRC alleges that the contract is a breach of a contract for approximately 1.8 million pounds. In paragraph 16, alleges that Continental acknowledged it as a multi-year agreement. Paragraph 18 alleges that Continental misses the shipment. In paragraphs 20, 26, 31, 34, 35, 36, BRC alleges the course of conduct and correspondence in which Continental missed shipments, demanded price increases, BRC demanded assurance, Continental then made equivocal statements that it would attempt to fulfill its duties at the 1.8 million pound level. After that, Continental again demanded price increases and again demanded accelerating pricing terms, and then BRC determined the contract to be repudiated. So after the remand, why not just ask for leave to amend to clean up the complaint? Your Honor, frankly, the reason we didn't ask for leave to amend was because this issue was live and was active in the case from the pleading stage. Continental in its own answer in paragraph 47 said that the agreement should be interpreted, required Continental to sell 1.8 million pounds. The issue was argued on summary judgment, now it's engaged actively on summary judgment. It was explored in discovery. Isn't it correct that the position you're taking now was both sides' fallback position in the earlier stages of the litigation? It was certainly a Continental position. You have to forgive me, we weren't counsel. Ms. Moses actually was counsel in the earlier phases of the case. I do expect Yes, I would characterize it as a fallback position for both sides, Your Honor. But I would say advanced more prominently by Continental than BRC. So it was a live issue throughout the case, and being a live issue and having been argued extensively by the parties, I didn't see any need to go back and amend the pleadings in what we would have thought would have been a services case where this court expressly commented that once a party is actively engaged and arguments have been presented on either side, it's a fairly empty exercise to go back and amend the pleadings. Counsel, can I ask you a question about enforceability of the contract as you're arguing it now? The defense is arguing that the written agreement is unenforceable because it is uncertain, among other things, as to the allocation of different grades of carbon black that are covered by the contract. What's your answer to that? And what do we have by way of evidence in the summary judgment proceedings in the district court that help us answer that? Your Honor, in the summary judgment proceedings before the court, the primary piece of evidence that shows that that contract is not uncertain because it does not address the individual grades. Is the fact that the parties for approximately 18 months operated under this agreement with no problems at all in determining amounts and dividing them by grades? Well, that doesn't really answer the question, right? Because Continental is telling us this is just a framework for individual orders, and agreeing on individual orders doesn't reveal anything about the overall enforceability for future years. So what else do you have? Well, whether or not that affects the enforceability is a question of whether the division of grades is essential to the contract. And we don't believe it is. Could you address that in terms, as I had asked, of the evidence and arguments presented in the summary judgment record? Yes, Your Honor. The evidence and argument presented in the summary judgment record limited exclusively to the unproblematic performance of the parties on the terms as they were presented, and we believe that demonstrates that the division of grade was not an essential term. If it were an essential term, our contention is the parties would have been unable to operate unproblematically for 18 months. Going back to the complaint, the amended complaint, tell me why you think there's an adequate demonstration in the complaint that you were suing on an anticipatory, you were alleging an anticipatory breach. That's basically what you were doing, right? Yes, Your Honor. Count three of the complaint is a repudiation anticipatory breach count. That, we'll admit, is characterized in terms of a requirements contract, but it also puts Continental on notice that this idea of repudiation is one at issue. In paragraph 52 of the complaint, which addresses repudiation, that sentence in paragraph 52 has two parts. One refers to Continental's refusal to provide BRC's requirements, which this court's prior order has shown us is no longer at issue. Also refers to the pricing, to Continental's demands for increased pricing, and those demands were made both before and after BRC requested assurance. So we believe that paragraphs 2026 31, 34, 35, 36, coupled with that allegation in paragraph 52 and the fact that BRC is seeking cover damages are sufficient to put Continental on notice that this was an issue in the complaint and this was a theory that BRC might pursue. There were memoranda submitted to the district court on remand as to how the case should proceed. Do they contain really anything that explains further the complaint in your view? To the extent that they point out to the court how the allegations of the complaint have developed through discovery, further information about the course of dealing, I don't believe there's much, if any, expressed discussion of the specific allegations of the complaint. I see. That's helpful. Thanks. On the question of anticipatory breach, we have Indiana language to the effect that anticipatory breach has to be, what's the magic phrase, positive, absolute, and unconditional. And from the perspective of the $1.8 million, or a million pound a year supply contract that is the framework for what we're disputing now, if I understand these facts correctly, they'd already sold you 1.35 million pounds by May of 2011 and said that they would continue to meet demands to meet the 1.8 million by the end of the year. Now I understand that's not sufficient for your client's purposes, but how do we get that positive, absolute, unconditional breach at that point? Your Honor, the Indiana Commercial Code provides expressly that one path to a repudiation is if a party is reasonably insecure about the other party's performance, requests assurance, and does not receive reasonable assurance. And that is what we're alleging occurred in this case, that Continental's course of conduct created reasonable insecurity into whether it was going to maintain its pricing, into whether it was going to maintain the payment period that BRC had been allowed. After some bobbles, their counsel's office came back in and said, yeah, we're going to meet that contract, right? I would disagree with that, Your Honor. After that characterization by their counsel's office, they again demanded pricing increases, and their best representations were equivocal and were couched in terms of what they would try to do if there was adequate supply. And that included their representations they would try to supply 1.8 million pounds, always couched in terms of what they had left over after they serviced their other customers. What you're basically saying is the complaint was enough to get you passed a motion to dismiss or summary judgment and to trial, whether you made the positive, absolute, unconditional, and or the reasonably insecure criterion. That was a question for judgment later on. Is that right? Yes, Your Honor. What the evidence should be. Yes, Your Honor. If there's nothing further, I'll reserve the remainder for rebuttal. Thank you. Thank you. Mr. Ryan. Good morning. May it please the Court, my name is Stephen Ryan and I represent Continental Carbon Company. I want to start with what Mr. Ryan has said that BRC left off with, which is this question of whether there was absolute, positive, unconditional repudiation or lack of adequate assurances. And this is an issue that BRC has, throughout this case, relied on putting the sequence of events out of order. So Judge Hamilton correctly pointed out that there were some baubles at the beginning, but by the time the counsel stepped in on May 20, 2011, and gave BRC's counsel exactly the assurance it asked for, without any equivocation or reservation. BRC's counsel said, please confirm by return email our discussion that Continental Carbon will continue producing and shipping timely at contract prices and will not cut off supply to BRC. And Continental's counsel replied, confirmed. After that... Referring only though to 1.8 million pounds, right? Correct. Continental has, from the beginning, viewed this agreement not as a requirements contract, but a pricing arrangement to allow for orders to be made and fulfilled at those prices. The events that BRC refers to as additional demands for prices was another misunderstanding, because after counsel had confirmed, provided assurances, BRC and Continental's representative had spoke and said, we will ship that next rail car to you at agreement prices. The person that put in a two percent, a two cent price increase, which all of Continental's customers had agreed to price increases of various amounts. This was still not corrected. There was no demand for price increase. Why aren't, why doesn't that sort of a record, though, produce a triable issue? Because, Your Honor, the fact that given that the agreement is not a requirements contract, as this Court has ruled, and in fact, the judicial admissions in the complaint show that they were assured of getting 1.8 million pounds, that those allegations in the complaint are inconsistent with their current position that the supply agreement required, that Continental had somehow refused to supply or make them assured of receiving 1.8 million pounds. The allegations in the complaint were that Continental had intended to cap supply at 1.8 million pounds. Now, and to be clear, we would not be here if BRC had, from the beginning, viewed this as an agreement for a fixed quantity of 1.8 million pounds. They never would have filed a lawsuit, because the parties were not in disagreement about how much would be supplied. Continental had repeatedly said its intent to supply 1.8 million pounds, that they were way ahead of schedule, they had been supplying almost double the contract rate, and there could be no issue that Continental intended to breach or repudiate the agreement at that point. There are several reasons to affirm the District Court's judgment, and one is that BRC was attempting to amend its complaint on summary judgment. The allegations in the complaint are not consistent with or contrary to, they contradict the current position, but even more importantly, this idea that the 1.8 million pounds was a fixed obligation. This Court has already said that it wasn't. Well, if we had decided that definitively, we should have ordered dismissal in the prior appeal, correct? I would, I believe I asked in that appeal to have that dismissed, but the Court's opinion... Okay, so that was left open. There's some language that helps you, obviously. Is it correct that the position plaintiff is taking now was your fallback position in the earlier stages? It was our fallback because it meant we could not have anticipatorily breached the contract. Right. But it also would suggest you're not really unfairly prejudiced by the Court's consideration of that theory, regardless of how it's framed in the complaint. It is, Your Honor, because it is one thing to take a position, knowing that that will absolve you from any possible liability, and to have the plaintiff say, that's the position, and it also means you facts in the record show that they were assured of getting 1.8 million pounds, and there was no absolute, positive, unconditional repudiation of that obligation. And so I think if we look to the standard for that, BRC had implicitly disclaimed any other characterization of those facts in the complaint. If you read the complaint, it is about a requirements contract, and that's a factual allegation as well as a legal one, because the reason it sued was because it was not assured of getting all of its requirements. Its reason for suing was that assurances of 1.8 million pounds were not adequate for its requirements, which were nearly 3 million pounds as it attempted to show a trial, and it went out and got a contract that specified it could get at least 3 million pounds, and any amount over that would be at higher prices. So the idea that it could change the entire basis of the lawsuit on those contradictory factual allegations is a violation of the Rule 15. It was changing its arguments on summary judgment, attempting to amend the complaint. It never made an attempt to amend the complaint in the district court, and it weighed those arguments. Now the other things we talked about in our brief were, and the other reason to affirm the court's judgment is that the supply agreement, given the court's interpretation, given the Seventh Circuit's interpretation, is an open offer for orders. That's the way this, what BRC is asking for is to have a requirements contract without calling it one. It's the same obligation just now with a cap on the amount that is required. The district court said that the relationship between BRC and Continental was a series of separate contracts. That is correct, Your Honor. Like the contracts in Brooklyn Bagel Boys versus Earth Grove Brains, which was a case this court cited in its first opinion. The pricing agreement, sorry, go ahead. So what, let's, we've got a number of provisions in here that certainly look like they're intended to be binding. Meet or release, for example, says that if the parties go through this process that your client will release BRC from any further obligations. What further obligations? Well, BRC had no obligation, Your Honor. As this court pointed out. Well, that seems hard to reconcile with all that language. BRC. And then we, if I, let me just, I mean the other points, we've got baseline prices are to remain firm throughout the term of this agreement. We've got the special provisions for the feedstock oil adjuster, the natural gas adjuster, the volume rebates and penalties. We've got a five-year term. That all feels an awful lot like a binding contract for approximately 1.8 million pounds a year. Your Honor, it may be binding as a pricing agreement, as an open offer for orders. Those are valid without consideration and they're irrevocable if you have consideration. But the only obligation in that agreement is for Continental to provide those binding terms at prices approximately 1.8 million pounds. The meter release, as this court has pointed out, BRC is not obligated to buy anything from Continental. And BRC could buy from other suppliers if it had terms other than price that were better. I mean, this court pointed out that there are reasons other than price to use other suppliers, for example, to protect itself, protect its supply and for other reasons, only if BRC decides to go with a lower offer does it have to go to Continental and give Continental a chance to meet it. Otherwise, BRC is free to do whatever it wants. It has no obligation to buy anything from Continental at all. So the idea that this is somehow a consideration to support the entire contract is misleading. Could you address the issue about the different grades? Yes, Your Honor. You all have asserted that they are not interchangeable, but I don't know what the evidence tells us about that. These three different types of carbon black. There are N339, N550, N762. There are dozens of or more grades of carbon black, but they are all independent, non-interchangeable products and they are used for different purposes. You said that in your brief. Yes, Your Honor. My question is about the evidence in the district court record. That was part of the basis for your motion for summary judgment, correct? Yes, Your Honor. In fact, BRC's complaint specifies that these are three different grades of carbon black that they need for different uses. And I would characterize the analogy may be helpful that if the agreement was for fruit and not carbon black, then you would have apples, oranges, and bananas with different prices. I appreciate the analogy. I get it. I understood what you said in your brief. What I'm asking you for is what's in the record. In the record, there was testimony at the trial. There's testimony from BRC's own witnesses, Mr. Cornwell, I believe, about what the different grades of carbon black are for. There's testimony from Mr. Mosia during his deposition about what 339 is used for, what N550 is used for, and what N762 is used for, and also what other grades of carbon black are out there that Continental makes and sells, but you can't use one grade to replace another. They are not interchangeable. And, in fact, as BRC argued throughout the first trial and before the summary judgment, that, in fact, not only were the grades important, but the formulation had to be so precise, and that's why it only wanted to use one or two. In layman's terms, could you describe the difference between a couple of them? Well, Your Honor, they're essentially what you could think of with the numbers is the fineness or the size of the particles that make up the product. And so if you're making a plastic product that might be something very used inside the dashboard of your car, which BRC makes things like that, I understand, you want a really fine filler product, N762, and a different one, N339, would not work for that product. It would be too rough. It would never make the plastic work. So what they are making, they have to have a specific grade for each one, and I think the record has that evidence in it in the form of testimony. From the first, from the trial? Yes, and those testimonies. On the requirements, contract damages? Yes, Your Honor, and in the discovery, and those were, I believe much of those deposition transcripts had been either introduced in briefing or in the trial. I don't know as I stand here what specific bits of testimony, but it was not a contested issue. Both sides agreed that these were different products. Thank you. And even if the court were to find, despite the lack of mutuality that Indiana law requires, that if you're going to have a contract for the sale of goods, for example, the other side has to be bound to buy it. Here we don't have BRC obligated to do anything, but if the contract were found to be enforceable, as a matter of law, Continental did not repudiate it. Both the BRC's admissions in the complaint and the undisputed facts in the record show that it was assured of receiving 1.8 million pounds of carbon black, which is the amount that BRC now claims it was owed, and there were no contrary facts to that. BRC coming up and saying that, well, that was equivocal or it didn't believe it, there's no evidence to support the idea that that was not true. And that was never developed, and I would also point out that was not BRC's fallback position, that this was a fixed quantity. It always pressed on the idea that this was an unlimited requirements contract, and it was only at trial that it was actually limited by the court from its nearly 4 million pounds it was claiming as cover damages to an amount of about 2.9 million. The Continental had only argued that because it meant that it was not liable. There was no liability under that complaint. And if the court has no further questions for me, I will conclude my comments. Thank you, Counsel. Thank you. Mr. Gade? Thank you, Your Honor. I'd like to first briefly address this idea of judicial admissions in the complaint that Continental had provided assurance. We believe that there's no question that in the complaint and actually throughout litigation, BRC has admitted freely that at least at one point in this long series of correspondence, Continental said, we will do our best with respect to the intent to supply at the 1.8 million pound level. That's undisputed. That's a fact that's in the complaint. That does not rise to an admission that Continental provided assurance, because that statement occurred in between two demands for price increases. It occurred before Continental demanded accelerated payment terms. It occurred in the immediate vicinity of Continental cutting off shipments. There was a whole pattern and mosaic of conduct that gave BRC reasonable insecurity about whether Continental was going to perform at even the 1.8 million pound per year level. So your view is there's sufficient circumstantial evidence that you could no longer rely on performance? Yes, and that even with that statement, a reasonable business would not have been assured. We believe there's enough evidence in the record to support that. Could you return for a moment, sir, to invite your attention to page 1516 of your reply brief to this question of the standard on anticipatory contracts in Indiana? You cited one. The bench has cited another. How do you reconcile? Well, Your Honor, I would say that we're a little bit apples and oranges. I would say there are two manners in which a contract in Indiana can be breached by anticipatory. There can be an anticipatory breach. One is if the clear and unambiguous standard that Continental is relying on is the circumstance in which a party to a contract picks up the phone and says, we know we have a contract, but we're not going to honor it. That's separate from what the Uniform Commercial Code in Indiana also provides, which is if a party to a contract becomes insecure about performance, they now have an entitlement to demand reasonable assurance, and the failure to provide that reasonable assurance is also a repudiation of the contract. So the clear and unambiguous standard I don't believe applies to this mechanism in the UCC that deals with demanding assurance when there's reasonable insecurity. Counsel for Continental also referenced this idea of disclaimer, that BRC had disclaimed the ability to look at the supply agreement as anything but a requirements contract. I would just say in the Vitamos case, to which that's a reference, the entire reason that disclaimer is frowned upon is because of surprise, the unfair surprise. This is a case where there's no question, there's no surprise. Continental raised this interpretation in its own amended answer. It argued it extensively. It elicited deposition testimony on it. The whole disclaimer, the rationale for that prohibition simply does not apply here. And if there's nothing further, thank you. Thank you, Counsel. Thanks to both Counsel. Case is taken under advisement.